# Hodges Brothers *v.* Coleman & Carroll.

*Attachment and Garnishment ; Contest of Garnishee's Answer.*

1. *Garnishment against purchaser from fraudulent grantee.*—When an attachment is sued out against a merchant who has transferred his stock of goods, and a sub-purchaser is summoned as garnishee, but denies any

[Hodges Brothers v. Coleman & Carroll.]

indebtedness or assets; his answer being contested, on the ground that the original sale by the debtor was fraudulent, that the garnishee bought with knowledge or notice of the fraud, and that he owes a balance on the price agreed to be paid by him; it is questionable whether a garnishment at law can reach such indebtedness; and if it can be sustained, the rights of the intermediate purchaser can not be adjudicated in his absence as a party.

2. *Same; sufficiency of issue tendered.*—In contesting the answer of such sub-purchaser and garnishee, an averment that he owes a balance for the agreed price of the goods, without more, does not show an indebtedness to the defendant in attachment, and is demurrable as a specification on which issue may be joined.

3. *Burden of proof, and evidence of fraud.*—Issue being joined on an allegation by the contesting creditor that the original sale was fraudulent, and that the sub-purchaser and garnishee had notice of such fraud, the burden of proof as to each of these facts, fraud and notice, is on the plaintiffs; and any evidence tending to show either fact is relevant and admissible.

4. *Notice of fraud; constructive.*—To charge a party with notice of fraud, it is not necessary that he should have actual notice, if he is chargeable with constructive notice; and this may be inferred from the knowledge of suggestive facts, which, if followed up, would have led to a discovery of the fraud; that is, facts of unusual or suspicious nature, having reference to the transaction sought to be impeached, and so related to it that, if faithfully pursued, and inquired into, they would have discovered its true character.

5. *Same; information and inquiry.*—As to the sufficiency of information to stimulate inquiry, the character of the person from whom it comes must be considered—that is, his relations and intimacy with the parties from whom direct information might naturally be expected, his connection with the particular transaction, his facilities for obtaining information, and the degree of knowledge displayed by him; and the information itself, whatever may be its source, must amount to something more than a vague and general statement that the title of the party proposing to sell is defective, or is subject to an equity.

6. *General rumor, or notoriety of notice.*—General knowledge of a fact in a community is evidence tending to show notice of such fact, its existence being otherwise shown; but general rumor that a particular sale was fraudulent, does not amount to general knowledge, or notoriety, and does not tend to show notice of fraud in the sale; nor is a general statement that a sale is fraudulent sufficient to put a purchaser on inquiry.

7. *Fraudulent sale of goods; facts putting sub-purchaser on inquiry.* Unusual circumstances, outside of the ordinary routine of commercial or mercantile business—such as great haste in consummating the sale; the unusual time, night; the fact that the sale embraces the entire stock in trade of an old house; the fact that the purchaser offered, on the next morning, to re-sell the entire stock at a price greatly below the invoice rates—if known to the sub-purchaser when proposing to buy, should have suggested inquiry into the *bona fides* and validity of the sale; and that inquiry should have been directed, not simply to the question whether the transaction was fair and free from fraud, but whether it was supported by a just and sufficient consideration, and whether any benefit was reserved to the vendor or grantor.

8. *Sale by failing debtor to creditor; validity as against other creditors.* Suspicious circumstances—such as great haste, consummating the sale by night, selling the entire stock in trade, etc.—do not necessarily prove fraud in the sale, but may be explained away by satisfactory proof that the vendor owed the purchaser an honest debt, and that the agreed price was not greatly less than the value of the goods; it not appearing that any benefit was reserved to the vendor beyond what the law allows.

[Hodges Brothers v. Coleman & Carroll.]

Within these limits, the law permits a creditor to be diligent in securing his debt from a failing debtor, though nothing be left for other creditors.

9. *Fraudulent sale of goods ; validity of re-sale to sub-purchaser.*—If the sub-purchaser and garnishee, having knowledge or notice of suspicious circumstances attending the original sale by the debtor, made honest and diligent inquiry into them, and was satisfied that the sale was fair, supported by a sufficient consideration, and reserved no benefit to the grantor, his purchase will be protected, although the original sale may be declared fraudulent; and, on the other hand, if the original sale be held not fraudulent, no inquiry can arise as to the sufficiency of his inquiry into any suspicious circumstances attending it.

10. *Proof of sub-purchaser's knowledge of suspicious circumstances ; objection to question and answer.*—A witness may be asked, if the sub-purchaser knew, at the time he bought the goods, of certain specified circumstances attending the original sale; and if it is not shown that he had the requisite opportunities of ascertaining the extent of the sub-purchaser's knowledge, a motion to exclude his answer is necessary.

11. *Charge as to validity of re-sale to sub-purchaser.*—A charge which instructs the jury that, if the original transaction was fraudulent, and if the sub-purchaser bought with knowledge of facts sufficient to put him on inquiry, then the jury should find for the attaching creditor, is erroneous, since it dispenses with all necessity for inquiry, and holds the sub-purchaser liable without regard to the result of inquiries honestly prosecuted.

12. *Sufficiency of inquiry by sub-purchaser.*—The sub-purchaser can not be required to make inquiry of the defrauded parties, since he can not be presumed to know who they were, and, if known, they would not best understand the facts to be inquired about—that is, the fact and consideration of the alleged sale; and if the sub-purchaser exercised the necessary diligence and good faith in making inquiry, and was reasonably convinced that the transaction was fair and honest, it is not necessary to his protection that his informants should have known " all the facts in evidence tending to show fraud."

13. *Same ; advice of attorney.*—When a party is put on inquiry, by knowledge or notice of suspicious circumstances, he can not safely rely on mere opinions that the transaction "is free from fraud," or that he " will get a good title;" and when the transaction consists of matters *en pais*, the advice of an attorney is worth nothing, unless based on a knowledge of the facts such as he could testify to.

14. *Charge requiring explanation, or tending to mislead.*—A charge which asserts a correct legal proposition, though expressed in language which has a tendency to mislead, is not a reversible error: the party complaining of it should ask an explanatory charge limiting its operation.

15. *Sale by debtor to creditor ; validity as against other creditors.* When a debtor, although insolvent, or in failing circumstances, makes an absolute sale of his property to a creditor, in payment of an antecedent debt, by way of preference over other creditors, the debt being honestly due, the price or consideration received being fair and adequate, and no interest being reserved by the grantor, his mere fraudulent intent does not vitiate the conveyance, because the act itself is legal, and fraud without damage gives no right of action. These concurrent facts absolutely rebut all inferences that might be drawn from attendant badges of fraud, and impart validity to the conveyance as an allowable preference of the particular creditor.

APPEAL from the Circuit Court of Pike.

Tried before the Hon. JOHN P. HUBBARD.

The appellants in this case, as partners, sued out an attachment on the 9th December, 1881, against Jackson & Brother,

a mercantile partnership doing business at Troy in said county of Pike; and summoned Coleman & Carroll, the appellees, by process of garnishment, as the debtors of said Jackson & Brother. The garnishees answered, and denied any indebtedness on their part to said Jackson & Brother, or any assets in their possession or under their control; but the answer was contested by the plaintiffs, and an issue was thereupon made up between the parties, as stated particularly in the opinion of this court. On the trial of this issue, a bill of exceptions was reserved by plaintiffs, in which the facts are thus stated:

"T. H. Jones, a witness for the plaintiff, testified, in substance, that on some night in December, 1881, between eleven and twelve o'clock, he was called on, at his residence in Troy, to assist in invoicing the stock of goods then in the store of said Jackson & Brother, and found, on his arrival at the store, that S. Bruner, H. Strassburger, E. Jackson, L. Jackson, H. Lyon, H. D. Green, and L. M. Baslinsky were there, and the invoicing had commenced; that they worked all night, and completed the invoice about six or seven o'clock in the morning; that he was called on, after the invoice was completed and footed up, and did witness two bills of sale of said stock of goods—one from said Jackson & Brother to S. Bruner, for a part, and the other from said Jackson & Brother to J. Loeb & Brother, for the other part; that said Strassburger was acting as agent for said Loeb & Brother, and that said stock invoiced, at cost, between $8,000 and $10,000. On cross-examination of said Jones, counsel for the garnishees asked him, whether Coleman & Carroll knew, at the time of their purchase, that said stock had been invoiced at night, or anything about it. Plaintiffs objected to this question, on the ground that it sought to obtain a negative answer from the witness, as evidence to show that Coleman & Carroll had no notice of the taking of said invoice at night. The court overruled said objection, and plaintiffs excepted. The witness answered, that Coleman & Carroll, so far as he knew, did not know that said invoice was taken at night.

"W. L. Wilson, a witness for plaintiffs, testified that he was in business in Troy, two or three doors from Jackson & Brother, for two or three years before December, 1881; that it was generally known in Troy, in the year 1881, that the financial condition of Jackson & Brother was not good; that they bought a very heavy stock in the fall of 1881, apparently about three times as large as previous stocks; that he saw, in the fall of 1881, several loads of goods leave their store in wagons,—one by a Mr. Hughes, at McDade's Pond, Florida, and others by parties unknown to witness; that said goods were

[Hodges Brothers v. Coleman & Carroll.]

packed in boxes, and not in the usual way when they sold in the usual course of trade ; and that it was generally rumored in Troy, on the morning after said invoice was taken, that Jackson had sold to Bruner and Loeb & Brother, and that Bruner had employed counsel. It was admitted that H. C. Bailey, agent of the Mobile & Girard Railroad Company at Troy, would testify, if present, that said Jackson & Brother, during the fall and early winter of 1881, shipped goods over said road from Troy, at various times—some consigned to one Bernheimer, at Union Springs, Ala. ; some to one Lyon, Hatchechubbee, Ala. ; and some to one Harris, at Columbus, Ga.— that said shipments agregated about 9,000 lbs., and extended over a period of several months ; and that it was not usual for merchants at Troy to make shipments of goods from that place to points along said road. H. D. Green, a witness for plaintiffs, testified that, in the year 1881, he was cashier of the Pike County Bank, and is now ; that S. Bruner came to Troy, a few days before the transfer of said stock of goods, and came into said bank, and inquired of witness as to Jackson's condition ; that witness told him, he thought Jackson could get over his troubles, if he could get some help ; that Jackson had been rather embarrassed for the year 1881, his paper having gone to protest a short while before said transfer, and also a year or two before ; that Jackson had accepted several drafts through said bank not long before the transfer ; that he (witness) was present a part of the time when the invoice was taken, and signed the bills of sale as a witness ; and that said Bruner and Strassburger came in on the nine o'clock train that night. Said witness stated also, on cross-examination, that he went with S. Bruner, in the evening after the transfer by Jackson & Brother, over to the store of Coleman & Carroll, and introduced him to W. S. Colman, of said firm, to whom Bruner then made propositions to sell said stock to him ; and that he (witness) told said Coleman, in the conversation, that he thought Jackson owed Bruner a good deal of money. Plaintiffs objected to this last statement made by said witness," and excepted to the overruling of their objection. " Said witness testified, also, that he told Coleman he thought it would be all right, and that he would get a good title ; also, that Bruner had loaned Jackson some four or six thousand dollars."

Several other exceptions were reserved by the plaintiffs to rulings on evidence, which the opinion of this court renders it unnecessary to state. The plaintiffs introduced other evidence, also, tending to show fraud on the part of Jackson & Brother in the transfer of their stock of goods to Bruner and Loeb & Brother, but a statement of this evidence is not necessary to an understanding of the points decided by this court. It was ad-

[Hodges Brothers v. Coleman & Carroll.]

mitted that, at the time said transfer was made, Jackson & Brother owed about $15,000, which was yet unpaid. It was proved that their debt to plaintiffs, amounting to about $1,300, was contracted for goods sold and delivered to them during the months of July, August, and October, 1881 ; and that in reply to inquiries as to their circumstances, at the time these purchases were made, they represented verbally to plaintiffs' agent, and to plaintiffs themselves in writing, that they were doing a good business, and that their financial condition was better than it had been for several years.

The defendants introduced said Strassburger as a witness, who testified, in substance, that Jackson & Brother owed Loeb & Brother, at the time of said transfer, about $3,900, for goods sold and delivered, as shown by the books of Loeb & Brother, who were merchants in Montgomery, and that the goods were taken in payment of this indebtedness. The bill of exceptions further states, " The garnishees then introduced the deposition of said S. Bruner, which is as follows ; " but the deposition is not set out. " W. S. Coleman testified, on behalf of the garnishees, that he bought said goods from said S. Bruner and Loeb & Brother, for his firm, on the evening of 2d December, 1881 ; that he paid sixty cents on the dollar for the groceries, and seventy cents for the dry-goods, on the invoice prices from said Jackson & Brother to them ; that the purchase was consummated about sunset that evening, and all the purchase-money was paid except about $1,700, which balance was paid about a month afterwards ; that said Bruner told him, during the negotiations, that Jackson & Brother owed him, and he took said goods in payment of this indebtedness, and that Strassburger made the same statement as to the goods he got for Loeb & Brother ; that said Bruner also stated, during said negotiations, that he had a letter written by Rice & Wiley, attorneys, at Montgomery, stating that any person who would buy said goods would get a good title, and that the bills of sale had been drawn by said Rice & Wiley after a full investigation, and that he would be safe in making the purchase ; that he also inquired of E. B. Wilkerson, president of said bank, and of H. D. Green, cashier of said bank, and of W. C. Wood, if they thought there was any fraud in the transfer from Jackson & Brother to Bruner and Loeb & Brother, or if he would run any risk in buying the goods from said Bruner and Loeb & Brother, and that each told him they thought there was no danger in buying said goods ; and that this was all the inquiry he made. There was other evidence, also, that Bruner and Loeb & Brother, during the day of the purchase by Coleman & Carroll, publicly tried to sell to other merchants in Troy, who bid upon the goods ; and that they (Coleman & Carroll)

[Hodges Brothers v. Coleman & Carroll.]

were advised by others that a purchase by them would be safe and all right."

On the evidence adduced, all of which the bill of exceptions purports to set out, and the substance of which is above stated, the plaintiffs asked the following charges to the jury:

" 1. If the transfer of the goods by Jackson & Brother to S. Bruner and Loeb & Brother was made with the intent on the part of all of them to hinder, delay or defraud the creditors of said Jackson & Brother, and Coleman & Carroll afterwards bought the goods from said Bruner and Loeb & Brother with knowledge of the fraud, or knew of facts sufficient to [put] them on inquiry, then Coleman & Carroll are liable as garnishees, and the jury must find for the plaintiffs.

" 2. If the jury believe there was fraud, and that Coleman & Carroll knew of the fraud, or had knowledge of facts or circumstances sufficient to put them upon inquiry; then the law makes it their duty to have made inquiry from the proper sources; and if the jury believe that they, or either of them, did make inquiry, but the same was made only from parties connected with the fraud, such inquiry does not protect them, but they should have gone to the parties defrauded.

" 3. If the jury believe, from the evidence, that either Coleman or Carroll had knowledge of facts or circumstances sufficient to put them on inquiry of the fraudulent intent, that was notice to them.

" 6. If the jury believe, from the evidence, that Coleman & Carroll had knowledge sufficient to put them upon inquiry that there was fraud, and that they, or either of them, made inquiries of E. B. Wilkerson, or H. D. Green, although the evidence may show that, from the information they obtained from said Wilkerson or Green, there was no fraud, yet this information will not protect them, unless the jury believe, from the evidence, that said Wilkerson or Green knew all the facts in evidence tending to show fraud."

The court refused each of these charges, and the plaintiffs duly excepted to their refusal; and they also excepted to the following charge, which was given by the court on the request of the garnishees: " If the jury believe, from the evidence, that on the 3d December, 1881, at the time Coleman & Carroll purchased the stock of goods from Strassburger and Bruner, they took the precaution to make an honest inquiry as to the right of said Bruner and Strassburger to sell said goods; that, in making the purchase, they acted upon the advice of Rice & Wiley, who had been of counsel for Loeb & Brother and Bruner, and had prepared bills of sale from Jackson & Brother to them respectively; that they also sought the advice of Col. E. B. Wilkerson and Capt. H. D. Green, who at that

time were connected with the only bank in Troy, and were advised that they (Coleman & Carroll) would get a good title, and that there was no risk in making the purchase; and that Coleman & Carroll made said purchase in good faith, and paid a valuable consideration therefor, and had no purpose to hinder, delay or defraud, or to aid Jackson & Brother in hindering or defrauding their creditors, then the jury must find for the garnishees."

The sustaining of the demurrer to one of the specifications in the issue tendered by the plaintiffs, the several rulings on evidence to which they reserved exceptions, the charge given, and the refusal of the several charges asked, are now assigned as error.

M. N. CARLISLE, for appellants.—(1.) It was immaterial to the plaintiffs, in this contest, whether they subjected the goods in the hands of the garnishees, or the unpaid balance due on their purchase; and they ought to have been allowed to contest each denial of the answer. If the garnishees still owed a balance on their purchase, and there was fraud in the original sale by Jackson & Brother to Bruner and Loeb & Brother, the garnishees could not set up the defense of innocent purchasers without notice as to that balance. If there was fraud in the original sale, the title to the goods remained in Jackson & ·Brothers; and if the garnishees had no notice of that fraud, they are entitled to protection only to the extent of the purchase-money paid before notice, or before service of the garnishment.—*Thames & Co. v. Rembert*, 63 Ala. 561; *Buford v. McCormick*, 57 Ala. 428; *Wells v. Morrow*, 38 Ala. 125; *Moore v. Clay*, 7 Ala. 742; Story's Equity, § 1502; Story's Eq. Pl. § 805.   (2.) That goods in the hands of a fraudulent grantee may be reached by garnishment, see *Henry v. Murphy & Co.*, 54 Ala. 246; *Price v. Masterson*, 35 Ala. 483; *Hazzard v. Franklin*, 2 Ala. 347; 1 Stew. & P. 189; 41 Ala. 242. (3.) Where the issue of fraud is involved, great latitude is allowed in the range of evidence.—*Snodgrass v. Br. Bank*, 25 Ala. 161; Bump on Fr. Conv. 560–61.   (4.) The first charge asked and refused asserts a correct proposition, and was justified by the evidence.—*Kelly v. Lehman, Durr & Co.*, 68 Ala. 192; *Lomax v. LeGrand*, 60 Ala. 543; *Boggs v. Price*, 64 Ala. 517; Wade on Notice, §§ 27, 30.   (5.) If the garnishees had notice of suspicious circumstances in the original sale, the extent of their inquiries for information became material; and it is submitted that they could not protect themselves, as the court allowed them to do in its rulings on the charges, by showing that they made inquiries of Green, or Wilkerson, or any other person not cognizant of all the material facts.

[Hodges Brothers v. Coleman & Carroll.]

GARDNER & WILEY, contra.—(1.) The plaintiffs could not assail the validity of the transfer of the goods, and at the same time condemn the unpaid balance due from the garnishees. *Golden v. Pierson*, 42 Ala. 370; *Sheppard v. Buford*, 7 Ala. 90. If they could do so, Bruner and Loeb & Brother should have been brought in by notice.—*Molton v. Escott*, 50 Ala. 77; *Boyd v. Cobbs*, 50 Ala. 82; *Simpson v. Tippin*, 5 Stew. & P. 208. (2.) The bill of exceptions purports to set out all the evidence, and fails to show fraud in the purchase by Bruner and Loeb & Brother from their common debtor.—*Crawford v. Kirksey*, 55 Ala. 282; *Lehman v. Kelly*, 68 Ala. 192. That transaction being valid, inquiry on the part of the garnishees was entirely unnecessary. It would be vain and useless for creditors to take property from their debtor in settlement of their just demands, if they were not allowed to dispose of it.

STONE, C. J.—Hodges Brothers were creditors of Jackson & Brother, and sued out attachment against them. The ground of the attachment was, that Jackson & Brother had fraudulently disposed of their property. The only levy of the attachment was a service on Coleman & Carroll as garnishees. Coleman & Carroll, being partners, made a joint answer to the garnishment, in which they say, that they were not indebted to the said defendants, Jackson & Brother, at the time of the service of the garnishment, nor at the time of making the answer, and would not be indebted to them in future by contract then existing, and that they had not in their possession, or under their control, personal nor real property, nor things in action, belonging to the defendants, nor did they have at the time of the service of the garnishment. This answer was controverted by the oath of plaintiffs' counsel, that he believed it to be untrue.

Plaintiffs in attachment tendered an issue, in which they averred that the answer was untrue, " in this: that at the time of service of the writ of garnishment, the said Coleman & Carroll were in possession of a stock of goods, wares and merchandise, which they claim to have bought from one Bruner and J. Loeb & Brother, who claimed to have bought from defendants. But plaintiffs aver that, in fact, there were no sales of said goods, either by Jackson & Brother to said Simon Bruner and J. Loeb & Brother, nor by said Simon Bruner and J. Loeb & Brother to said Coleman & Carroll; but, if there were such sales, then said plaintiffs [aver] that the transfer of said stock of goods, &c., to said Bruner and said J. Loeb & Brother was for the purpose of hindering, delaying, or defrauding the creditors of said Jackson & Brother, and that said W. S. Coleman and J. S. Carroll had notice of the same. Plaintiffs aver

that, at said time, there was a balance due said Bruner and J. Loeb & Brother by said Coleman & Carroll." Garnishees took issue on the first of the above specifications, and demurred to the second. The Circuit Court sustained the demurrer, and that ruling presents one of the errors assigned.

It will be observed that the first of the specifications relies for recovery. on the averment, that there was either no sale from Jackson to Bruner and Loeb, and from Bruner and Loeb to Coleman & Carroll, or that the sale from Jackson to Bruner and Loeb was fraudulent, and that Coleman & Carroll purchased with knowledge of that fact. Each of these phases of the averment seeks to show that the merchandise itself, in the hands of Coleman & Carroll, was subject to be seized and sold under plaintiffs' attachment. If the plaintiffs succeeded in making good that averment, then it would have been the duty of the court to render judgment of condemnation, and that the goods be delivered up on demand, and sold by the sheriff in satisfaction of plaintiffs' claim.—Code of 1876; §§ 3295 *et seq.* Such proceeding seeks no money judgment against the garnishee, in the first instance. It seeks to discover property, and make it liable. Not so the second specification. If sufficient in its averments, it seeks to show that Coleman & Carroll are indebted, and seeks to recover a money judgment against them. In other words, that they are, in effect, indebted to Jackson & Brother.

It is contended for garnishees, that garnishment at law is not the proper process for reaching a liability, such as plaintiffs seek here to establish. The argument is, that inasmuch as plaintiffs, to maintain their claim, must set aside and avoid the sale from Jackson to Bruner and Loeb, for fraud, thus leaving the ownership of the goods in Jackson, and converting Coleman & Carroll into purchasers from the latter, this would be to claim both against and under the alleged sale to Bruner and Loeb. Against it, in this, that it passed no title to them; under it, in this, that it enabled them to sell the goods to Coleman & Carroll, and thus create a debt from the latter to Jackson, whom they did not know in the transaction. It is questionable if garnishment at law is flexible enough for such redress as this.—*Godden v. Pierson*, 42 Ala. 370. And it is equally questionable, whether such proceeding will withstand the test, that garnishment at law can condemn only such liability as will support debt, or *indebitatus assumpsit*, by the defendant debtor against the garnishee.—1 Brick. Dig. 175, §§ 313, 314; *Simpson v. Tippin*, 5 Stew. & Por. 208; *Jones v. Crews*, 64 Ala. 368. And if such proceeding could, in any case, be maintained, the rights of the intermediate party—Bruner and Loeb in this case—could not be pronounced upon,

without first bringing them in by notice.—*Moore v. Escott*, 50 Ala. 77 ; *Boyd v. Cobbs, Ib.* 82.

We need not, however, consider or decide the question last above raised. The entire averment is, that "there was a balance due said Bruner and Loeb & Brother from Coleman & Carroll." Not a word said as to the consideration, or occasion of such balance of indebtedness. That the garnishees were indebted to Bruner and Loeb, certainly would not, without more, show that such indebtedness should be condemned for the payment of Jackson's debt. This averment, to be good, should have been made sufficient in itself. The demurrer to this specification was rightfully sustained; and by that ruling, this case, in the court below, was narrowed to the inquiry, had Coleman & Carroll, when summoned as garnishees, merchandise in their possession, which should be condemned to the payment of Jackson's debt to plaintiffs. This inquiry made it necessary to determine, first, whether the sale to Bruner and Loeb was *bona fide*, or fraudulent; and, second, if fraudulent, were Coleman & Carroll *bona fide* purchasers for value, without notice. On each of these issues—fraud, or *mala fides* in the sale by Jackson to Bruner and Loeb, and notice of such fraud traced to Coleman & Carroll—the burden of proof was on the attaching plaintiffs.

Notice, to be sufficient, need not always be actual. On the contrary, it is sufficient if it be constructive, or if it be shown that the party sought to be charged had knowledge of suggestive facts, which, if followed up, would have led to a discovery of the fraud. To come within the clause last expressed, the known fact or facts must be of unusual or suspicious nature, must have reference to the transaction sought to be impeached, and must so relate to it as that, if faithfully pursued and inquired into, they will lead to a knowledge of the fraud committed. Bear in mind, we are dealing now with the second phase of the inquiry—the question of notice to Coleman & Carroll, of a fraud perpetrated by Jackson and Bruner and Loeb on Hodges Brothers—the proof of which fraud is an entirely different matter, dependent on entirely different testimony. We are dealing with this question, as if fraud in the sale from Jackson to Bruner and Loeb was conceded. It follows, that any testimony, lawful in form, tending to prove either of these disputed facts, ought to have been admitted.

On the question of information, sufficient to stimulate inquiry, two questions arise : first, the character of the person from whom the information comes—namely, his relations and intimacy with the parties from whom direct information might naturally be expected to come ; his connection with the transaction, and his facilities for obtaining information, as well as

8

[Hodges Brothers v. Coleman & Carroll.]

the degree of knowledge he displays, should all be considered, before the party contemplating a purchase can venture with safety to utterly disregard his advice. Notice coming from a friend or relation of the adverse claimant may be sufficient, while the vague reports of mere strangers have been adjudged not enough to charge the conscience of the purchaser.—Wade on Notice, § 28.

Whatever be the source of information, to be effectual as a substitute for actual notice, it must amount to something more than a vague statement that the vendor's title is subject to an equity. Coming even from the guardian of an equitable claimant, the mere warning to the proposed purchaser that he will purchase at his peril, has been decided to be insufficient. Wild or general statements like these could not put the party upon inquiry, for the reason that they do not tend to direct his attention to any specific source of knowledge; and it is contrary to reason and common sense, that one should be prevented from purchasing, by what he might fairly regard as the idle gossip of busy bodies.—*Ib.* § 29; 2 Brick. Dig. 520, §§ 183, 190.

In this case, it would seem that Coleman & Carroll did institute inquiry, before they made their purchase. The question raised in the charges is, mainly, that they did not prosecute the inquiry far enough, nor trace it to the proper source of obtainable information. The notice of circumstances, which it is claimed should have put them on inquiry, is predicated mainly of the time of the alleged sale by Jackson Brothers, and of the haste and other circumstances attending it. To these must be added, the unusual sale and shipment of considerable parts of their stock of merchandise, before the final sale. It was also attempted to be proved that, on the morning after the alleged sale at night, it was rumored in the town that the sale was fraudulent. General knowledge of a fact in a community may be proved, as evidence tending to trace notice of such fact, its existence being otherwise shown.—1 Brick. Dig. 847, §§ 616, 617, 618, 619. General rumor that a particular sale was fraudulent, does not amount to general knowledge, or notoriety, and is not legal evidence tending to show notice. Nor is the mere general statement that a transaction is fraudulent sufficient to put a contemplated purchaser on inquiry, for the reason that such notice does not tend to direct attention to any specific source of knowledge.

We do not mean, in what we have said, to announce, as matter of law, that there were no circumstances attending this transaction, which should have put Coleman & Carroll on inquiry. The haste with which the transaction was gotten up and consummated; the time chosen; the fact that a mercantile

[Hodges Brothers v. Coleman & Carroll.]

firm of some years standing should cease to exist by a sweeping sale of its entire merchandise in the night time; the additional fact, that the purchasers did not propose to continue the business, but offered to resell the goods in a lot, at a price greatly below invoice rates; these, together with any other circumstances outside of the usual, mercantile routine, to the extent they may be shown, or fairly presumed to have been known to Coleman & Carroll, should have suggested inquiry. Inquiry, not in the brief formula, 'Is this transaction fair, and free from fraud?' but inquiry as to the consideration upon which the sale was rested. If, in such inquiry, fairly and honestly conducted, the transaction appear to be fair—seem to rest upon a just and sufficient consideration, and reserve no benefit to the grantor, other than what the law would secure to him, then he may purchase with safety, although the original transaction may be afterwards shown to be fraudulent. The law exacts of him honesty of purpose, and reasonable diligence, not infallibility.

Nor do we intend to intimate that, in the original sale from Jackson to Bruner and Loeb, there was necessarily fraud. All the attending circumstances of suspicion may be explained away, if there be satisfactory proof that Jackson in good faith owed the alleged debts to Bruner and Loeb, that in payment thereof he sold the merchandise to them at not greatly less than their value, and it be not shown that he reserved or secured a benefit to himself. Within these restrictions, the law allows a creditor to be diligent—extra-diligent, if he will—to secure his own just claim against a failing debtor, even though, in doing so, he leave nothing with which to pay other debts. But, to maintain their purchase, the burden was on Bruner and Loeb, and if they had notice, under the rules above, on Coleman & Carroll, to prove the existence of such debts from Jackson to Bruner and Loeb. We do not mean to say that, in all conditions, this duty would rest on Coleman & Carroll. Their liability and duty would depend on the diligence and fidelity with which they prosecuted inquiry, as declared above. Of course, if they prove that Jackson owed the alleged debts, that in payment of them he sold the merchandise, at a price not materially below its value, and there is not shown to have been reserved a benefit to Jackson, beyond what the law secures him, then the title of Bruner and Loeb was good, and the title of Coleman & Carroll is placed beyond the reach of Jackson's creditors.—*Crawford v. Kirksey*, 55 Ala. 282; *Thames v. Rembert*, 63 Ala. 561; *Lehman v. Kelly*, 68 Ala. 192.

It only remains to apply these principles to the several rulings of the court to which exceptions were reserved.

The question put to the witness Jones was not objectionable

in itself. It may have been more naturally a question that should have come from the other side, if the witness knew, or was supposed to know, any thing in reply to it. Coleman & Carroll's knowledge of suspicious circumstances was within the issue being tried by the jury, and any lawful testimony tending to prove it, no matter by whom offered, was competent. Hence, the question was not objectionable. The admissibility of the answer was a different question, which could have been raised only by a motion to exclude it from the jury. It is not shown the witness had ample opportunities of knowing the extent of knowledge Coleman & Carroll had, of the matter inquired about.— *Ward v. Reynolds*, 32 Ala. 384. The answer given falls within the rule declared in *Gilbert v. Gilbert*, 22 Ala. 529. But, as there was no motion to reject the answer as evidence, there is nothing for us to review.

Defendants were permitted to prove that, while Bruner and Loeb's agent were making proposals to sell the goods to Coleman & Carroll, Green, cashier of a bank in the place, informed them "that he thought Jackson owed Bruner a good deal of money." This was objected to. Offered, as it was, for the purpose of showing that Coleman & Carroll were making inquiry as to the fairness of the transaction, this was competent evidence. Its sufficiency was for the jury. It was not legal evidence that such debt in fact existed. There was no error in the other rulings on evidence.

The first and third charges asked by plaintiffs, and refused, present substantially the same question. Each of them affirms, that if the sale from Jackson to Bruner and Loeb was fraudulent, and if Coleman & Carroll bought the goods with knowledge of sufficient facts to put them on inquiry, then the jury must find for the plaintiffs. If these charges are correct, then it would seem that parties, thus notified of suspicious circumstances, need not pursue the inquiry, as it can accomplish nothing. Pursuing the inquiry can not benefit them, because, according to the language of the charges, having knowledge of facts sufficient to put them on inquiry, their liability is fastened, no matter what discoveries the inquiry might lead to. Such is not the rule, as we have shown above. The sense and policy of the rule are, that parties having notice of such suspicious facts or circumstances, must not blindly or recklessly disregard them. They must honestly and diligently make inquiry—inquiry of persons best calculated to give information —before hazarding a purchase. And if upon such inquiry, honestly and diligently made, the transaction seem to be fair and upon a proper consideration, then the purchase may be safely made, even though it be afterwards shown that the first sale was in fact fraudulent. It is only when known suspicious

facts and circumstances are entirely disregarded—facts and circumstances which, if followed up, would probably lead to a discovery of the fraud ; or, when such suspicious facts and circumstances followed up, lead to confirmation of the fraud, or the inquiry is conducted so heedlessly and imperfectly as to lead to no satisfactory explanation of the attendant suspicious facts and circumstances, that notice of facts sufficient to put one on inquiry is the equivalent of notice of the fraud itself. We are speaking now of suspicious matters *in pais*, and not of such defects as will necessarily be discovered, in tracing a chain of title backward. The hypothesis of the charges is not broad enough. The known facts must not only be such as to put on inquiry, but they must so relate to the transaction as to point to its true nature, and must be such as, if honestly and diligently pursued, will lead to a discovery of the fraud. As suggested above, the most important inquiry in this case was, the fact and amount of indebtedness from Jackson to Bruner and Loeb, and whether the transaction was a real sale, on fair consideration, reserving no benefit to Jackson. The charges as asked were misleading, and were rightly refused.—*Crawford v. Kirksey*, 55 Ala. 282; *Lehman v. Kelly*, 68 Ala. 192.

The fault of the second charge is, that it required Coleman & Carroll to inquire of the parties defrauded. It could not be presumed they would know who were the parties defrauded, nor that such defrauded parties would best understand the factum and consideration of the alleged sale. These, as we have shown, were the proper subjects on which Coleman & Carroll should have made inquiry.

Diligence and good faith were what the law required of Coleman & Carroll, in making inquiry. If they come up to this standard, and were reasonably convinced the transaction was fair and honest, it was not necessary to their protection that their informants should know " all the facts in evidence tending to show fraud." The sixth charge was properly refused.

In what we have said above, we have simply pronounced on the various rulings of the court. The sufficiency of the inquiry was sought to be raised by some of the charges, but, in such case, the charge was burdened with something else, which forbade its being given.

The charge given at the instance of the garnishees presents the only remaining question. We have stated above what are the main inquiries in this case. First, was the sale from Jackson to Bruner and Loeb *bona fide*? In other words, did Jackson in fact owe them, as is claimed, and did he sell them the goods at a price not materially below their value, in payment of such indebtedness? If this be so, notwithstanding the circumstances attending the sale, if no benefit, other than the

payment of his debts, was secured to Jackson, then the transaction was fair in law, and Coleman & Carroll ought to recover, no matter how suspicious the transaction looked, or what knowledge they had of it. Such actual sale, on such consideration, although a preference of two, at the expense of all other creditors, the law allows. If such sale, on such consideration, be found to exist, then the jury need inquire no further, but should find for the garnishees.

Suppose, however, this part of the transaction is not sufficiently shown to the satisfaction of the jury. Then the good faith with which Coleman & Carroll purchased becomes a material inquiry. The charge we are considering presents this question. Said charge asserts the right of Coleman & Carroll to a verdict, on the following hypothesis of facts: "That Coleman & Carroll took the precaution to make an honest inquiry as to the right of Bruner and Strassburger to sell said goods; that in making the purchase they acted on the advice of R. & W., who had been of counsel for Loeb & Brother and Bruner, and had prepared bills of sale from Jackson & Brother to them respectively; that they also sought the advice of Col. E. B. Wilkerson and Capt. H. D. Green, who at that time were connected with the only bank in the city of Troy, and were advised that they (Coleman & Carroll) would get a good title, and there was no risk in making the purchase; and that said Coleman & Carroll made said purchase in good faith, paid a valuable consideration therefor, and had no purpose to hinder, delay or defraud, or to aid Jackson & Brother in hindering or defrauding their creditors."

We were, at first, inclined to hold this charge faulty, in that its recital of advice sought and obtained, was not of the facts which constituted the transaction. Mere opinions that a transaction is free from fraud, or that a purchaser will get a good title, is not the sort of information one must seek, when the facts and circumstances put him on inquiry; and when the transaction consists of matters *in pais*, as this did—when consideration and motive are the tests by which legality is determined—an opinion on the whole case, even by an attorney, that it is valid or legal, is worth nothing, unless based on a knowledge of the facts, such as he could testify to. We do not wish to underrate the value of legal advice. When given on undisputed facts, or on facts stated as true, then it should have its due weight. It is professional, or skillful knowledge. When, however, the validity of the sale depends primarily on the consideration it rests on, and, secondarily, whether any benefit is thereby secured to the insolvent seller, no one, not having personal knowledge of the actual consideration, and of the entire terms of the agreement of sale, can pronounce on

[Hodges Brothers v. Coleman & Carroll.]

its validity. That is but a legal determination, after the facts are ascertained, and can not, before such ascertainment, become the subject of unqualified professional advice. The hypothesis, however, goes farther, and predicates honest inquiry and good faith, as elements of the defense. The charge may have been misleading to the average mind. If so, it presented a case for an explanatory charge, explaining and limiting its operation. 1 Brick. Dig. 344, § 129; *Callan v. McDaniel*, 72 Ala. 96.

We said above that the first inquiry in this case was, the question of indebtedness from Jackson & Brother to Bruner and Loeb, whether it was reasonably commensurate with the value of the goods purchased, and then, rebuttingly, whether any benefit was reserved to Jackson beyond what the law would secure to him. We said further, if the first two of these inquiries be found affirmatively, and the last negatively, then the title of Bruner and Loeb was unassailable, and necessarily the title of Coleman & Carroll is good. We said this, with the intention that it shall be understood, and become a rule, to the full extent it imports. The law gives to a failing debtor the right to prefer one or more creditors, to the entire exclusion of all others, provided he keeps himself within the boundaries above prescribed. All he does, then, is lawfully done; and the omitted creditors have no right to complain, so far. While he is paying an honest debt with his own effects—all of them, if you please—at a reasonably fair valuation, and reserving to himself no benefit, he wrongs no one—takes from no one any thing he has a right to claim. Can any unpaid creditor complain of this, simply because the seller may have had a secret motive for doing it, which did not benefit the seller pecuniarily? What injury can such secret motive do to a non-preferred creditor? The act, we have seen, is lawful. Can human tribunals set aside a transaction, lawful in itself, because the actors had an evil mind in doing it? Can there be fraud in doing a lawful act, even though it be prompted by an evil motive, or badges of fraud, which injures no one and can injure no one, and withholds from no one any thing that he can lay claim to? "Fraud does not consist in mere intention, but in intention carried out by hurtful acts.—Bump Fraud. Con., 3d ed., 19. "Acts which are done in pursuance of a statute, can not be deemed fraudulent."—*Ib.* 29. "An assignment for the benefit of creditors, may be made for the express purpose of defeating an execution. The creditor may be baffled, or even eventually lose his debt, but there is no obstacle interposed between him and any property which belongs to the debtor." *Ib.* 21. "Fraud without damage is not sufficient to support an action, nor is it ground for relief in equity. Fraud can never, in judicial proceedings, be predicated of a mere emotion

[Meyer & Co. v. Sulzbacher.]

of the mind, disconnected from an act occasioning an injury to some one."—3 Wait Ac. & Def. 442, 453, and authorities cited ; 1 Bouv. Law Dic., *Fraud*, 614, § 9 ; *Pasley v. Freeman*, 2 T. R. 23 ; *Lehman v. Kelly*, 68 Ala. 192 ; *Seaman v. Nolen*, *Ib.* 463 ; *Chamberlain v. Dorrance*, 69 Ala. 40 ; *Crawford v. Kirksey*, 55 Ala. 282; *Holbird v. Anderson*, 3 T. R. 235 ; *Cavanhovan v. Hart*, 21 Penn. St. 495; *Wood v. Dixie*, 7 Adol. & Ellis (53 Eng. Com. Law), 892 ; *Howitz v. Ellinger*, 31 Md. 492 ; *Gassett v. Wilson*, 3 Fla. 235 ; *Wheaton v. Neville*, 19 Cal. 42.

There is no error in the record, and the judgment of the Circuit Court is affirmed.

SOMERVILLE, J.—There has been some confusion heretofore in the statement of the rule by which the validity of alleged fraudulent conveyances made by debtors to their creditors should be tested. I understand this rule, as stated in the opinion of the Chief-Justice in this case, to be substantially as follows : When a debtor, although insolvent, or in failing circumstances, makes an absolute sale of his property to a creditor, in payment of an antecedent debt, by way of preference over other creditors, the debt being honestly due, and the price or consideration received being fair and adequate, and no interest being reserved by the grantor, his mere fraudulent intent does not vitiate the conveyance, because the act itself is legal, and fraud without damage gives no right of action. These concurrent facts absolutely rebut all inferences that might be drawn from attendant badges of fraud, and impart validity to the conveyance as an allowable preference of the particular creditor.

I am of opinion that this is the sound rule on this subject, and is sustained by both principle and authority ; and a clear understanding of it will obviate much confusion in the administration of justice in our courts, by imparting to the verdicts of juries, in cases of this character, less of caprice, and more of fixed principle and uniform impartiality.